IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:18-cr-123-RDA-2 |
| ) | |
| ELMER ZELAYA MARTINEZ, ) | Sentencing: October 19, 2022 |
| ) | |
| Defendant. ) | |
| ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The defendant, Elmer Zelaya Martinez, comes before the Court for sentencing after having been convicted by a jury of all eight counts with which he was charged.[1] The defendant, a former First Word of the Virginia sector of the Park View Locos Salvatrucha ("PVLS") clique of the transnational gang La Mara Salvatrucha, better known as "MS-13," stood trial for his leading role in the wanton and unspeakably violent murders of two teenage boys—Edvin Eduardo Escobar Mendez and Sergio Anthony Arita Triminio—in August and September of 2016, respectively. Given the crimes of which the defendant has been convicted, this is the rare sentencing in which this Court ultimately has little discretion to exercise. That is because the applicable statutes require the imposition of at least four life sentences. Congress has thus decided that the defendant, for his misconduct, must spend the rest of his life behind bars. Importantly, though, it is not just the law but also justice that compels this outcome. Justice for Edvin. Justice for Sergio. And justice for their families.

---

[1] Specifically, after an eight-week trial, the jury convicted the defendant of two counts of conspiracy to commit kidnapping and murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5) (Counts 1 and 2); two counts of conspiracy to kidnap, in violation of 18 U.S.C. § 1201(c) (Counts 3 and 4); two counts of murder in aid of racketeering activity, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Counts 5 and 6); and two counts of kidnapping resulting in death, in violation of 18 U.S.C. §§ 1201(a)(1) and 2 (Counts 7 and 8).

I.   **FACTUAL BACKGROUND**

The defendant is the twelfth person to be sentenced in connection with this case, the facts of which are exceedingly well known to the Court. Given the Court's familiarity with the underlying details, the government provides here just a brief summary.

A.   **The Kidnapping and Murder of Edvin Eduardo Escobar Mendez**

Edvin immigrated to the United States from Guatemala, where he was born. In the summer of 2016, when Edvin was 17 years old, he was introduced by his friend, Sergio, who was then 13 years old, to members and associates of PVLS. Sergio was a prospective member of the clique who wanted Edvin to join the gang, too.

At the time, the defendant, who was 25 years old and went by the moniker "Chucho," was an associate of MS-13's PVLS clique who held the position of *chequeo*, a term used to describe a prospective member of MS-13 who associates with the gang's members, known as homeboys, and is required to do whatever the homeboys request in order eventually to be promoted to a homeboy in the gang. The defendant associated with other members and associates of the PVLS clique, including his brother, Henry Zelaya Martinez ("Henry Zelaya"), Ronald Herrera Contreras ("Herrera"), Josue Vigil Mejia ("Vigil"), Erick Palacios Ruiz ("Palacios"), Francisco Avila Avalos ("Avila"), Anderson Villatoro Rivera ("Villatoro), Yonathan Melgar Martinez ("Melgar"), Pablo Velasco Barrera ("Velasco"), Duglas Ramirez Ferrera ("Ramirez"), Edwin Orellana Caballero ("Orellana"), Oscar Contreras Aguilar ("Contreras"), Edenilson Misael Alfaro ("Alfaro"), Fredys Baires Abarca ("Baires"), O.S.R., and Moris Castro Coreas ("Castro").

In early August 2016, Sergio learned that Edvin had posted on his Facebook page a photograph depicting a man wearing a mask with the numbers "666" superimposed around his head and the words "Black Metal" typed below. The photograph was then circulated among

2

PVLS members who concluded—based on that photograph alone—that Edvin was actually a member of the rival 18th Street gang.[2] Because, under MS-13's rules, all rival gang members (who are referred to as *chavalas*) must be attacked and killed, PVLS leadership in Virginia, including the defendant, arranged to have Edvin lured to a park where he could be murdered.

On August 28, 2016, Edvin was advised that a gang meeting would be taking place that night and was directed to take a bus to Alexandria, Virginia, that evening. Edvin did so and was met by Vigil, Avila, and Palacios, all of whom rode a bus to Alexandria. Once they arrived in Alexandria, Edvin, Vigil, Avila, and Palacios walked to the vicinity of Holmes Run Stream Valley Park ("Holmes Run Park") in Fairfax County, Virginia, and joined several members and associates of MS-13 who were already there, including the defendant.

The group then walked to Homes Run Park. Thereafter, in a wooded area in the park, the defendant grabbed Edvin while others attacked him. The defendant and the rest of the group stabbed Edvin with knives and also struck him with a machete and a pickaxe until he was dead. Some of those who participated in the murder also buried Edvin's body in the park that night. Edvin's remains, after they were exhumed approximately six months later, were autopsied. During her examination, the medical examiner counted 111 stab or chop wounds visible in what remained of Edvin's soft tissue. Edvin left behind his parents and three siblings, all of whom are devastated by Edvin's murder.

For participating in Edvin's murder, the defendant was promoted from *chequeo* to *pase a homeboy*, which is the title given to a gang member who has earned the status of homeboy but who has yet to be "jumped" into the gang. In mid-September 2016, the defendant, along with

---

[2] To date, law enforcement has not uncovered any evidence to suggest that Edvin was a member or associate of a rival gang.

Henry Zelaya and Vigil, traveled to New York, where all three men were "jumped in" as homeboys. The defendant also changed his gang moniker to "Killer Asesino."

### B. The Kidnapping and Murder of Sergio Anthony Arita Triminio

Edvin's friend, Sergio, was born in Honduras. On the night that Edvin was murdered, Sergio, who had turned 14 approximately one week earlier, was in juvenile detention. Upon his release, and after learning of Edvin's disappearance, Sergio asked the defendant whether Edvin had been given "court" for "the photo." Henry Zelaya, Vigil, and the defendant already suspected that Sergio was cooperating with police based on information relayed by Herrera and a member of another clique. Based on Sergio's inquiry about Edvin and the fact that Sergio was already suspected of cooperating with law enforcement, the defendant and others within PVLS's leadership concluded (erroneously) that Sergio was a snitch and should be killed as a result.

On the evening of September 26, 2016, the defendant asked Sergio to come to a gang meeting that he said would be held later that night. Sergio walked from his home to the parking lot of a Target store in Falls Church, Virginia, where he met up with several members and associates of MS-13, including the defendant, Herrera, Palacios, Velasco, Avila, Villatoro, and Castro, all of whom had arrived in a large SUV. After picking up Sergio, the group drove to Holmes Run Park, where they met up with Henry Zelaya, Ramirez, Orellana, Melgar, Baires, and O.S.R.

There, in the same wooded area of the park where Edvin had been slain, Herrera grabbed Sergio by the neck while others stabbed him to death with knives, machetes, and a pickaxe. The participants in the assault also recorded the murder on a cell phone. After Sergio was dead, the killers dug a hole and buried Sergio's body.

Sergio's remains were also later exhumed and autopsied. The results of that examination revealed that Sergio sustained myriad sharp-force injuries over virtually every part of his body.

4

So forceful were the blows he suffered that his mandible was bisected and both of his femurs and one of his fibulas were fractured. Sergio left behind a bereft mother, with whom he lived and who was pregnant at the time of his death, and a younger sister.

## II.     OVERVIEW OF APPLICABLE LAW

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the Guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citation omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the Guidelines range and the remaining § 3553(a) factors because the Guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007).

For example, the Guidelines encompass the most salient aspects of "the nature and circumstances of the offense" (by establishing an offense level that incorporates aggravating or mitigating circumstances such as loss amounts, number of victims, and a defendant's role in the offense), as well as reflect "the history and characteristics of the defendant" (most notably by establishing a criminal history category based on the defendant's prior criminal record). 18

5

U.S.C. § 3553(a)(1). The Guidelines further help to prevent "unwarranted sentencing disparities" by ensuring that defendants who have committed similar crimes and have similar criminal records will receive roughly similar sentences, regardless of the district and courtroom in which they are sentenced. *Id.* § 3553(a)(6); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Thus, although the Guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall*, 552 U.S. at 49.

### III. APPLICATION OF THE § 3553(a) FACTORS

The evidence adduced at trial proved that the defendant played a leading role in conceiving, planning, and executing the murders of Edvin and Sergio, mere boys who stood nearly six inches shorter than the defendant and weighed roughly half as much as him. In both episodes, the defendant was one of the initial attackers who stabbed the defenseless, initially unsuspecting victims while they were still conscious. Evidently, neither their anguished screams nor their looks of horror as the knowledge of their imminent demise dawned upon them dissuaded the defendant from carrying on. Nor did he feel any remorse in the aftermath of the killings, instead boasting on Facebook about what he and his underlings had done and bragging about having committed two murders in one month's time.

In trying to account for the defendant's depravity, it is clear that no demons or deprivations from his past drove him to become a murderer. He was raised by both of his parents, who were able to cover all of his basic needs, saw that he attended school regularly through ninth grade, and, after they immigrated to the United States, sent money back home to support the defendant and his siblings. Whereas much of El Salvador was riven by gang

6

violence, the defendant's family, by his own telling, was not directly affected by it during his youth.  Upon his arrival in this county, the defendant seems not to have struggled to secure gainful employment and he appears never to have seriously contended with alcohol or substance abuse problems.

Nor can the defendant's actions be explained by immaturity.  Unlike several of his co-conspirators, who like the victims in this case were still teenagers in 2016, the defendant was a 25-year-old man—indeed, the oldest of Edvin's and Sergio's killers.  His active role in their murders was not a product of youthful indiscretion, just as it was not a result of simply being in the wrong place at the wrong time.  The defendant made a choice.  Instead of putting his effort into productive ends, like providing for the two children he had at the time, he purposefully sought out opportunities to ascend the ranks of a gang that, in the final analysis, stands for practically nothing—a criminal enterprise that seems to perpetrate violence for violence's sake alone and aspires above all else to control territory through fear.  Edvin's and Sergio's lives were nothing more to the defendant than a means to his end of becoming a homeboy and leader of his clique.

Simply put, the defendant is a malignancy, one that, thanks to the multiple life sentences that the Court is obligated to impose, will never again infect free society.  Of course, the deterrent effect of a life sentence in this case extends beyond the defendant insofar as it will put on notice other members and associates of MS-13 who must understand that there will be severe repercussions for committing violent crimes in furtherance of their gang's illicit activities or to advance within the gang's ranks.  Likewise, they must know that neither MS-13 nor any other gang will be permitted to operate with impunity in this country.

Finally, a life sentence will achieve some measure of justice for the victims and their loved ones, who have suffered unimaginable pain at the hands of the defendant and his fellow

gangsters. No sentence will permanently heal their wounds, but a life behinds bars for the defendant will at least help to salve them.

## IV. RECOMMENDED SENTENCES

Because the Court must impose a life sentence for each of Counts 5–8, the defendant's fate is essentially preordained. Still, the Court must impose a sentence for each of the remaining counts. In light of the considerations discussed above, the government respectfully requests that the Court impose such sentences as follows:

| Count Number | Description of Offense | Permissible Term | Recommended Sentence |
| --- | --- | --- | --- |
| 1 | Conspiracy to commit kidnapping and murder of Edvin Eduardo Escobar Mendez in aid of racketeering activity | Up to 10 years | 10 years |
| 2 | Conspiracy to commit kidnapping and murder of Sergio Anthony Arita Triminio in aid of racketeering activity | Up to 10 years | 10 years |
| 3 | Conspiracy to kidnap Edvin Eduardo Escobar Mendez | Any term of years or Life | Life |
| 4 | Conspiracy to kidnap Sergio Anthony Arita Triminio | Any term of years or Life | Life |
| 5 | Murder of Edvin Eduardo Escobar Mendez in aid of racketeering activity | Life | Life |
| 6 | Murder of Sergio Anthony Arita Triminio in aid of racketeering activity | Life | Life |
| 7 | Kidnapping of Edvin Eduardo Escobar Mendez resulting in death | Life | Life |
| 8 | Kidnapping of Sergio Anthony Arita Triminio resulting in death | Life | Life |

## V. CONCLUSION

In this case, tragedy abounds. Edvin was not a *chavala*, and Sergio was not a snitch. Nevertheless, mere proximity to MS-13 and its twisted code cost those two boys their lives. In the wake of that carnage, which the defendant played a prominent role in sewing, lie three wrecked families. Edvin's family to this day struggles to accept and cope with his loss. Sergio's mother, who was pregnant at the time Sergio disappeared and nearly lost the child she was

carrying because of her anguish, has to relive the trauma of her loss every time she looks at her youngest son—the little brother that her firstborn son, Sergio, was hoping to have.  The defendant's family has been scathed, too.  The mother of the defendant and his co-defendant brother, Henry Zelaya, will have to bear the pain of lifelong separation from her sons and the shame that comes with knowing that two of her children are murderers.

Sentencing the defendant to life imprisonment will account for the nature of his crimes, protect the public, serve as a deterrent to other gang members, and, perhaps most importantly, bring justice on behalf of Edvin and Sergio and their grieving families.  Accordingly, the government respectfully asks the Court to impose a sentence of 10 years on each of Counts 1 and 2 and life imprisonment on each of Counts 3 through 8, all to run concurrently with one another.  Additionally, the government recommends that the Court impose a three-year term of supervised release for Counts 1 and 2 and a five-year term of supervised release for each of the remaining counts, all to run concurrently with one another, which the defendant shall serve should he ever be released from the custody of the Bureau or Prisons and return to the United States.[3]  Finally, the government will be seeking restitution on behalf of Edvin's and Sergio's family members and asks that, pursuant to 18 U.S.C. § 3664(d)(5), the Court allow the government to arrive at a final determination of the victims' losses no later than November 28, 2022 (that is, 60 days after the sentencing of Henry Zelaya, the first of the defendant's co-defendants to be sentenced).  *See* 18 U.S.C. § 3664(d)(5) ("If the victim's losses are not ascertainable . . . prior to sentencing, . . .

---

[3] Ordinarily, a court should not impose a term of supervised release in a case, like this one, in which supervised release is not required by statute and the defendant is a deportable alien.  U.S.S.G. § 5D1.1, application note 5.  However, a court should consider imposing a term of supervised release on such a defendant if it determines that doing so "would provide an added measure of deterrence and protection based on the facts and circumstances of the particular case."  *Id.*  Given that the defendant, during his time in this country, murdered two juveniles, such an added measure of deterrence and protection is needed and can be achieved by imposing a term of supervised release.

the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.").

                Respectfully submitted,

                Jessica D. Aber
                United States Attorney

By:      /s/
                Alexander E. Blanchard
                Cristina C. Stam
                Assistant United States Attorneys
                United States Attorney's Office
                2100 Jamieson Avenue
                Alexandria, Virginia 22314
                Tel: (703) 299-3700
                Fax: (703) 299-3982
                alexander.blanchard@usdoj.gov
                cristina.stam@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on October 12, 2022, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

                                                /s/
                                       Alexander E. Blanchard
                                       Assistant United States Attorney